1831.

M'Cartee
v.
Teller.

---

### M'CARTEE *vs.* TELLER and wife.

A legal jointure, settled upon an infant before marriage, is a legal bar of her dower ; and by analogy to the statute, a competent and certain provision, settled upon the infant in bar of dower, to which there is no other objection but its mere equitable quality, is an equitable bar of dower.

To make a mere equitable jointure binding on the infant, the provision should be as beneficial to her, and as certain, as that required in the legal jointure to constitute a legal bar.

The equitable provision, to bar dower, must be a provision to take effect in possession or profit immediately on the death of the husband, and to continue during the life of the widow ; and it must be a reasonable and competent livelihood for the wife, in reference to the circumstances and situation in life of the parties, the value of the husband's estate, and the extent of the portion received with the wife on her marriage.

An estate for life, or during the widowhood of the grantee, is a base or determinable freehold ; and if an adult actually accepts such an estate in lieu of dower, it will constitute a legal bar ; but if such an estate is settled upon an infant, who has no legal capacity to consent to an acceptance of such a qualified freehold, it will not bar her dower.

Where the husband entered into an ante-nuptial contract with an infant and her guardian, by which she was to receive a certain annual sum during her widowhood, in lieu of dower, *it was held,* that she was not bound by the agreement, and might disaffirm the same and claim her dower, after the death of her husband.

But by the revised statutes, the distinction between legal and equitable jointures is abolished ; and any estate or pecuniary provision made for the benefit of the wife, whether an adult or an infant, in lieu of dower, will, if assented to by her in the manner prescribed in the revised statutes, now constitute a *legal* bar of her dower.

1831.

M'Cartee
v.
Teller.

August 2d.

In February, 1817, Philip Jacobs, aged about 75 years, married Elizabeth Brown, then an infant under the age of twenty one. By an ante-nuptial agreement, made a few days previous to the marriage, executed by both parties, and also by the general guardian of the infant, it was agreed on the part of the husband, that upon his death the widow should receive an annuity of $1200, out of his estate, during her widowhood : and should have all his household furniture, and a set of plate, to her own use absolutely. It was further agreed that, in case of her re-marriage, the annuity should cease, and that in lieu thereof she should receive the sum of $1000 in gross ; which sums, and the furniture and plate, were declared to be settled on her in lieu of all dower, and all right, title, or claim of dower, which she might otherwise acquire by her marriage. These payments were to be made to her, however, upon condition that she remained chaste during coverture, and contracted no debts exceeding the sum of $20, for which the husband might be made liable, without his knowledge or consent. And the infant, with the approbation and consent of her guardian, acknowledged herself satisfied with this provision ; and agreed to relinquish all claim of dower which she would otherwise acquire in the real estate of which her husband might be seised, at the time of the marriage, or afterwards. Jacobs died in October, 1818, leaving his wife then ensient of a female child, which was born in January, thereafter, and lived about two years. At the time of the marriage of Jacobs, and at his death, he was seised of a large real estate, and was possessed of considerable personal property. A short time before his death he made a will, in due form of law to pass real estate, and thereby, after a great number of pecuniary legacies to other persons, he gave to his wife $6000 ; to be received by her in lieu of all dower to which she might by law be entitled out of his estate, and also in lieu of all claims on her part under the marriage articles, if she should be willing to receive that sum in lieu of her dower and of her said claims under the marriage articles. The wife was required by the will to make her election, to take under the will or under the marriage articles, within thirty days after notice of the bequest, and after the death of the testator ;

and, if she elected to take the provision contained in the will, she was to cancel the marriage articles, and execute a release of dower in the estate, before payment of the legacy. The testator then disposed of the residue of his estate as follows: " Item. It is my will, that if at the time of my decease there shall be any child of mine alive, that then all the rents and profits of my real estate shall be received by the executors hereinafter named, or the survivor or survivors of them, and be applied by him or them to the support, maintenance and education of such child, until such child attain the age of twenty one years or intermarry; and if from the yearly application of the said rents and profits to the purposes aforesaid, there should be a surplus remaining, the said executors, or the survivor or survivors of them, shall, from time to time, in his or their discretion, invest the same in some safe stock for the benefit of such child, to be paid over to such child at the age of twenty one years, or on marriage, which ever event shall first take place; and that my said executors, or the survivor or survivors of them, receive for such their trouble and attention, such sums as the law may allow. Item: After the payment of all legacies contained in this my last will, I do hereby give, devise and bequeath all the rest, residue and remainder of my estate, real and personal, to the Orphan Asylum Society in the city of New-York, to be applied to the charitable purposes for which said asylum was established; this bequest to take effect immediately after all other debts and legacies are paid, if I should leave no child at the time of my death; or if I should leave a child, then upon the death, intermarriage, or the attaining of the age of twenty one years by such child. Item: I do hereby devise and bequeath unto my said executors, and the survivor or survivors of them, or such of them as may act in the premises, all my real estate, of whatever nature or kind the same may be, subject to the trusts aforesaid. And it is my will that whenever such child shall attain the age of twenty one years, or marry, that my real estate be sold by my said executors or the survivors of them, or such of them as may act herein, and the one half of the proceeds thereof paid to my said child, if the said child shall attain the age of twenty one

years or marry. And lastly, I do nominate and appoint my worthy friends, Peter McCartee, R. Cunnyngham and J. Anthon, all of the city of New-York, to be the executors of this my last will and testament." The will was proved by all the executors, and by the consent of the other executors, P. M'Cartee took the exclusive possession of the real estate of the testator in the city of New-York, except two small lots taken by the corporation for the improvement of one of the streets in the city. In February, 1821, the widow of Jacobs intermarried with Teller, her present husband.

In April, 1830, the complainant filed his bill in this cause against Teller and wife, before the vice chancellor of the first circuit, setting forth the above facts, and alleging, among other things, that soon after the death of Jacobs, the complainant was advised by one of his co-executors, that the ante-nuptial contract was not binding on the wife on account of her infancy, and was no bar to her right of dower in the estate of her late husband; that as she claimed her dower therein, the complainant continued to pay her one third part of the rents and profits of the estate for her supposed right of dower, until the first of November, 1821; that after that time he obtained the marriage articles, and submitted them to his counsel, who advised him that they were valid and binding on the widow, and that she was not entitled to dower; that in conformity with the advice of such counsel, the complainant had ever since denied the right to dower, and had refused to pay over to the defendants the third of the rents and profits of the estate. The complainant further alleged in his bill, that the defendants acquiesced in his decision, not to allow the widow her dower, until 1828, when they filed their bill in this court against him, to recover such dower, which suit is still pending and undetermined; and that they had also recently commenced several ejectment suits against the tenants of the complainant, for the purpose of obtaining dower in the premises in the possession of such tenants, in which suits the complainant had been admitted to defend as landlord. And the complainant prayed, among other things, that the marriage articles might be established as binding on the defendants, and be decreed an equitable bar

to the widow's dower ; and that the defendants might be decreed to accept of the provision thereby made, in full satisfaction of all claims for dower, &c. He also prayed for an injunction restraining the defendants from proceeding at law against him or his tenants, to recover dower in the real estate of Jacobs, and for general relief. A motion for a preliminary injunction was thereupon made by the complainant, and argued before the vice chancellor, who denied the same, on the ground that the executors had no interest in the real estate under the will ; and that therefore the complainant had no right to file a bill for an injunction. From this decision the complainant appealed to the chancellor.

The following is the opinion of Judge EDWARDS:

This is an application to restrain the defendants from proceeding at law to recover dower, upon the ground that they have filed their bill in this court for the recovery of it, and that the complainant has a defence or offset which he cannot avail himself of at law. A preliminary point has been submitted, whether the complainant has such an interest in the premises in question, as entitles him to call upon this court to issue an injunction. If he has no interest in the premises, he has no right to make any such call. And it is also an established rule, " that if the complainant's right appears to be doubtful, the court always refuses to interfere." ( *Eden on Inj*. 233, *and the authorities there cited*. ) If the complainant has any legal right to the premises, it must be either 1st, as devisee of the property, or 2d, as trustee by the expressed terms of the will, or 3d, as trustee by operation of law. As to the first case, as the testator gave his whole estate to his child and the Orphan Asylum, and as there is nothing to create a doubt but that he believed those to be valid devises, there is no room for an inference that in any event he intended that their trustees should have the estate. 2. As to whether the complainant is a trustee by the expressed terms of the will. So far as it respects the child, the trust is terminated by its death. And as it respects the Orphan

June 28, 1830.

Asylum, the court of errors has decided that the complainant was not a trustee for them, but on the contrary, on the death of the child, that the estate was devised directly to them. And the decision against them turned on this point. 3. If the defendent, then, has any legal interest in the premises, it must be as trustee by operation of law, and this is the only remaining question in the case. It is contended, as the devise to the Orphan Asylum was void, and as the whole estate was devised to the trustees, subject to the trusts specified in the will, that the estate necessarily remains in them. But the court of errors has decided that the complainant never was a trustee for the Orphan Asylum after the death of the child ; but on the contrary, on the happening of that event, that the testator devised the estate directly to them.

Now as the intent of the trust, as well as of the devises, must be governed by the intention of the testator, if follows that he intended that the trusteeship should cease the moment he intended that there should be nothing left in the hands of the trustee to hold in trust. To suppose otherwise, would be to suppose that he meant to continue trustees without their having any thing to hold in trust ; and as a trusteeship without a trust would be an anomaly in the law, I do not consider myself as warranted in arriving at any such conclusion. This marks the boundary and limitation of the powers of the trustees, as prescribed by the testator himself, and beyond this the trustees cannot pass. This view of the subject is in accordance with the opinion of the judge, with whom a majority of the court concurred. For he says in conclusion : " My opinion upon the whole case rests on this ground, that on the death of the child the estate was devised directly to the respondents, and that after that event there were no trusts to execute, those imposed upon them by the testator having ceased."

If then it is asked what becomes of this devise, 1 reply, it goes where all other void devises do, to the heirs. The whole fallacy in this case arises from not duly considering the intent of the trust. If it was, as its terms seem to import, that the trustees were to hold the property until others legally took it, then of course the legal estate would still be in the

trustee. But according to the decision of the court of errors, the trust as gathered from the general tenor of the will, was only co-extensive with the cardinal object which the testator had in view, which was mainly the preservation of the estate for the benefit of the child, and that when that end failed, the trust ceased. The trustee was not placed absolutely in the shoes of the testator, but only to a qualified extent. If the Orphan Asylum could have taken the property, they could have done it without any act of the trustee, as the devise was directly to them. This would of course have put an end to the trusteeship; and as there is not a shadow of ground for presuming that the testator ever doubted the legality of that devise, there is no ground for presuming that he intended that the power of the trustee should be extended; if the devise proved invalid, as the direction which property must take variant from that prescribed by law, must be governed by the will of the testator, and as he has failed to give any other valid direction, it is now left undisposed of by him, and must take the usual direction prescribed by the laws in such cases. Under these views of the case, the motion for an injunction is denied.

1831.

M'Cartee
v.
Teller.

----

The following is the opinion of Judge EDWARDS, in the cause of Teller and wife v. Mc'Cartee:

Feb. 8th.
1830.

The main question in this cause is, whether the ante-nuptial contract, entered into between the said Elizabeth, was of such a nature as to be binding upon her, she being an infant at the time it was entered into.

No rule of the common law is better established than that the contracts of an infant are voidable at his election. This rule is as binding in a court of equity as in a court of law. Prior to the English statute relative to jointures, all ante-nuptial contracts entered into by infants were, I apprehend, voidable; and the cases since that time, in which they are held to be obligatory, are confined to those which are within the equity of that statute, or, in other words, to cases in which, by a decree for a specific execution, the provisions

of that statute will be complied with. The leading case upon this subject is that of *Drury* v. *Drury*, which was decided by the house of lords. This case proceeded upon the assumption that the husband covenanted to charge his estate with the payment of the annuity which he agreed to leave his intended wife, then an infant. Although the covenant, in this particular, was ambiguous, yet it was urged upon the court that such was the import of it, and the court certainly yielded to that impression, as it made a specific decree to that effect. Roper, in commenting upon it, considers it as settling these positions, viz: 1. That a covenant to make a jointure, which would be good in law, if it had been actually settled, will have the same effect in equity; 2. That it is not necessary that the jointure should be of real estate, as the literal construction of the statute requires; if from the terms of the instrument the heir is bound, and the widow may have the thing settled as agreed, to be so secured out of lands. (1 Roper, 473.) He also says: "If, however, the jointure be defective in any of the particulars which have been adjudged necessary to bring the provision within the intent and meaning of the statute of jointure, it will not, it is presumed, bar the infant." It is true that there are many cases in the books, rendering obligatory ante-nuptial contracts, which do not contain those requisites; but, with two exceptions, they are all cases in which the wife was of age when she entered into the contract. That an ante-nuptial contract is not binding upon the infant, unless within the equity of the statute, although secured upon lands, from the uncertainty of its taking effect on the death of the husband, was also decided in the case of *Caruthers* v. *Caruthers*, (4 Bro. C. C. 500.) The first of the two cases above referred to, is that of *Jordan* v. *Savage*, in 3 Bac. Abr. 717. This was a covenant to settle copy hold lands on the wife, in lieu of her customary dower in the same lands, and it was decided to be a bar of the dower. The case, however, is too imperfectly reported to afford full and satisfactory information of the ground upon which it proceeded. The other case is that of *Williams* v. *Chitty*, (3 Ves. 545,) where it was decided that a settlement before marriage, on an infant, of leasehold property, was a bar to her dower

1831.

M'Cartee
v.
Teller.

No reasons are given by the chancellor, and his opinion is only implied by overruling an exception to a master's report. These cases are too bald to afford satisfactory ground for shaking a fundamental rule of law.

According to these views, the case then resolves itself into this question: Was there such a covenant, on the part of Philip Jacobs, as would, if carried into execution, have brought this case within the equity of the statute, or, in other words, would have enabled this court to have conveyed to her such an estate as would comply with the requisitions of the statute relative to jointures. Philip Jacobs covenants for himself, his heirs, executors, &c. that out of his estate, his heirs, executors, &c. shall pay annually the sum of $1200, in half yearly payments, to the said Elizabeth, during widowhood, in lieu of dower. There is no provision that any part of his estate shall be charged with the payment specifically; but it is a mere naked covenant to pay, and this court could not compel the heirs to settle any of the real estate upon the wife, without travelling beyond the covenant. It is not, therefore, such a covenant as would enable the court to compel the heirs to make such a provision as the statute requires, and consequently is not valid.

There is, I apprehend, another objection to this contract. The covenant on the part of Jacobs is upon condition, among other things, "that she shall not contract any debt over $20, without his knowledge and assent." A violation of this provision would of course have left her without any provision at his death. In that event, therefore, there would be no jointure; for jointure is a provision to take effect on the death of the husband. Now, although the authorities sanction a condition subsequent, compatable with the continuance of the jointure for life, yet no case can be found to sanction the principle that it may be defeated by an act previous to the death of the husband, and above all, I apprehend that a court of equity, (the guardians of the rights of infants,) would never sanction so unreasonable a condition. And if this contract was not binding at its inception, it could not be rendered so by the accidental circumstance of the es-

tate or annuity not being defeated by a violation of the con-dition upon which it was granted.

The remaining question is, whether the defendant has as-signed dower out of the rents. It is alleged in the bill that he did. The defendant admits that he paid her one third of the rents, from time to time, for her dower, but under a mis-take as to her legal rights, and denies that he assigned her dower. The testimony proves that he admitted her right to dower, and made payments of one third of the rents in sat-isfaction of it. Is this, then, an assignment of dower?

It is fully established by authorities, that " as dower is a ti-tle created by law, out of particular estates and interests, it allows the widow to accept of rent out of the same estates, by some assignment, without deed. (And. R. 288. Hob. 153. Co. Litt. 34, b.)

It appears to me that the assignment of one third of the rents, by the defendant to the wife of the complainant, for her dower, was as completely made as it could be without deed ; and as this was not necessary, and as the assignment was accepted by her, I am of course of opinion that she is entitled to the rents so assigned.

I shall therefore decree that the defendant account for so much of the rents received by him, as the wife is entitled to for her dower, and that it be referred to David Codwise, one of the masters, to take and state the account, and that the complainants be at liberty to examine the defendant under oath, relative to the premises before the master.

---

*B. F. Buttler & John Duer*, for the complainant. The complainant being in the possession of the premises sought to be recovered, is entitled to the aid of this court, for the purpose of establishing an equitable bar to the claim of dow-er, even though it be conceded he has no title to the premis-es. The cases cited in Eden on Inj. 233, were cases where a party out of possession applied for an injunction to stay waste, &c. They are not applicable to cases where the par-ty is in possession under a claim of title, and applies to stay a suit at law, and the subject matter is within the cognizance

of the court of chancery. Equity has concurrent jurisdiction as to legal, and exclusive as to equitable bars of d .wer. (*Jones* v. *Powell*, 6 Johns. Ch. R. 194.) The defendants ought to have been put to their election, whether to proceed at law or in chancery. (Eden on Inj. 27. *Rogers* v. *Vosburgh*, 4 Johns. Ch. R. 84. *Livingston* v. *Kane*, 3 id. 224.) By proceeding to argument in the cause in chancery, they have elected to proceed in the latter tribunal ; and the suit at law should be restrained. The complainant, as acting executor, has a valid and subsisting title to the premises in controversy ; absolute at law, although subject, in equity, to a resulting trust in favor of the heirs at law of Philip Jacobs, if any there be.

It was contended below, and has been so held by the vice chancellor, that, on the death of the child, all the interest and estate of the executors, and all their control over the estate ceased. This was not the decision of the court of errors in the case of *M'Cartee* v. *Orphan Asylum Society* (9 Cowen, 437 ;) nor was any opinion to this effect expressed by any of its members. 1. The question was not before the court, whether the devise to the corporation being void, the estate continued in the trustees after the death of the child. The sole questions were : 1. Whether the devise to the corporation, in the event of the death of the child, was or was not a direct devise ? And, if it was, 2. Whether the corporation had power to take under such a devise ? It being determined that the devise was *direct*, and that the corporation had no power to take, the cause was at an end. It would be unreasonable to suppose that the court intended to go further, and to decide a question not raised by the case, and not argued by the counsel. It is important to confine the decisions of the court of errors to the precise case and points before them. This rule is applicable to every court of dernier resort. The expressions of Judge Woodworth, (9 Cowen, 505,) refer to the intent of the testator, and express the state of things which would have existed, in case the corporation had been capable of taking. To illustrate both, he speaks of the ulterior devise as having actually taken effect. But that he did not intend to state the actual condition and rights of the parties,

1831.

M'Cartee
v.
Teller.

1831.

M'Cartee
v.
Teller.

,is evident from the manner in which he speaks of the estate having vested in the corporation, when the result of his opinion was, that the estate did not, and could not, so vest. Judge Sutherland states the same idea, but in such a manner as to avoid this.

Under the will of P. Jacobs, the legal estate in the premises vested, on the birth of the child, in the executors. The birth of the child was, however, a condition precedent ; without it the executors would have had no estate, because the devise, if there was no child, was direct to the Orphan Asylum. But on the birth of a child, the estate fully vested in the executors, without entry. (6 Cruise, 9, § 14.) But the executors did in fact enter. It was admitted by all in the case of *M'Cartee* v. *The Orphan Asylum*, (9 Cowen, 437,) that the estate vested in the executors, and continued so vested in them, at all events, until the death of the child. (See opinion of Chancellor Jones, in the case last cited, 9 Cowen's R. 467, 502 ; of Woodworth, J id. 506. and of Stebbins, Sen. id. 516.) The character of this estate in the executors was a fee, subject in equity to the trust described in the will ; and if the limitation over to the Orphan Asylum had been to parties competent to take, then, both at law and in equity, such estate in fee would have been liable to be defeated by the death of the child. That the estate was in fee, is apparent from the words " all my real estate," &c. (*Jackson* v. *Merrill*, 6 Johns. R. 191. and cases there cited. *Lambert's Lessee* v. *Paine*, 3 Cranch, 97.) The executors were to receive rents and sell. This implies a fee. (*Jackson* v. *De Lancy*, 13 John. R. 537. 6 Cruise, 264, § 72 to 74, tit. 38, ch. 11.) This was the opinion of Chancellor Jones. (9 Cowen, 502.) This fee was, in equity, subject to the trusts specified in the will ; but as they could only be enforced in equity, such subserviency to those trusts did not effect the legal character of the estate. Nor did it qualify the perfection of the legal estate. There was, however, another provision in the will which did affect and qualify the character of the fee, i. e. the limitation over, in the event of the death of the child, to the Orphan Asylum. If that corporation had been capable of taking, the estate devised to the

executors would have been defeasible at law, i. e. liable to be defeated on the death of the child. It would have been so, because the ulterior devise, although the limitation of a fee on a fee, would have been good by way of executory devise. It was to take effect within the period allowed by law. But even if the Orphan Asylum had possessed a capacity to take, the possibility of its taking on the happening of the contingency, would neither have given an estate in the corporation, nor have diminished the quantity of the estate in the trustees, though it would have affected its quality. It was a mere possibility coupled with an interest, which they might have released, or extinguished, or bound in equity by contract; but which could not be granted or transferred by any common law conveyance, because not an estate. (1 Preston on Estates, 75, 76.) Then as to the trustees. Their estate, instead of being a fee simple in the highest sense of the word, was, by force of this limitation over, supposing it to be good, reduced in quality to a determinable or qualified fee. It might continue forever, (i. e. if the child lived,) and therefore a fee; (1 Prest. 482;) but as there was a possibility that it might not continue forever, it was only a qualified fee. These fees are treated of by Preston, vol. 1, p. 430 to 435: "It is a quality of these estates, that though they may continue forever, they may be determined by some act or event, expressed on their limitation, to circumscribe their continuance, or enforced by law, as bounding their extent." Preston refers to this head of determinable fees the leasing of estates in fee, subject to executory devises. (Co. Litt. 18, a. in § 11. 4 Kent's Com. 9, and cases there cited.) The qualified, base, or determinable fee, held by the trustees, was an estate on a condition subsequent, and on that species of condition subsequent, called a limitation, or a condition in law. (2 Bl. Com. 155 to 157.) As if the Orphan Asylum had been capable of taking the estate, it would, on the death of the child, have instantly vested in that corporation, without any entry or act on the part of the heir, or of any other person. But as the Orphan Asylum had no capacity to take, and as the limitation over was therefore void, and failed to take effect, the question arises: What became of the estate

of the trustee on the death of the child? It is supposed by the vice chancellor to have ceased, and reverted to the heirs of the testator. We contend that it remained in the trustees, and not only remained, but became absolute and indefeasible at law. The legal estate was not made to depend on the continuance or validity of the trusts, as is erroneously supposed by the vice chancellor. It is as well settled as any other proposition of the law, (until R. S.) that an estate, if granted or devised to trustees, continues in them, though the particular trusts fail; and that it cannot and does not, by reason of such failure, go to the heir at law. Hence the whole doctrine of resulting trusts in favor of the heir. Every such case is a proof that the estate of the trustees continued. Chancellor Jones repudiated the idea that the estate of the trustees ceased; (9 Cowen, 502;) and he cites *Doe* v. *Copestake,* (6 East, 328.) As to this point we cite, *Burgess* v. *Wheate,* 1 Eden, 177, and 1 W. Black. 123, S. C.; *Finlay et al.* v. *King's Lessee,* 3 Peters' R. 383.

The estate could not revert to the heir of the testator, because, by his devise to the executors, the testator parted with all his estate, and there could be no reversion, nor a possibility of a reverter. (4 Kent's Com. 349. Co. Litt, 134, a. b. Seymour's case, 10 Coke's R. 97. b. Ld. *Mansfield in Burgess* v. *Wheate,* 1 Eden, 229. 2 W. Black. 165.) There is but one case where there is even a possibility of reverter, after granting the whole estate; and that is the case of a *conditional fee.* (4 Kent's Com. 349, 10, 12.) If we consider the estate of the executors as a determinable fee, the result will be the same. (1 Prest. 440, 470. 2 Black. Com. 156, 157. Co. Litt. 206, a. b. 4 Kent's Com. 9.) So also if we consider it as an executory devise. If the executory devise is void, or is defeated by the failure of the event on which it is to vest, &c. the estate of the first taker becomes absolute, and there is no reverter to the right heirs of the testator. (*Jackson* v. *Ball,* 10 John. R. 19. *Jackson* v. *Staats,* 11 John. R. 338, 351. 2 Preston on Estates, 441 to 445. 2 Bl. Com. 152, 157.) In *Jackson* v. *Ball,* p. 351, Spencer, J. held that if the estate over does not take effect, because there is no person *in esse* to take, although the event had happened up-

on which the estate was to vest, it became absolute in the first taker, and did not go to the heirs of the testator. The executors having no beneficial interest in the estate, does not prevent the applicability of these principles, as we are now discussing a mere legal question ; and no injurious consequences will result from these principles, as the estate having been intended as a trust, a trust results in equity to the heirs at law of the testator. (Saunders on Uses & Trusts, 216, 218. 1 Cruise, 475, 477, tit. 12, ch. 1, § 38. 4 Kent's Com. 300, 301. *Hobart* v. *Comitiss. Suffolk et al.* 2 Vern. 644. *Lloyd* v. *Spillet*, 2 Atk. 150. *Nash* v. *Smith*, 17 Ves. jun. 29. *Burgess* v. *Wheate*, 1 Eden, 177.) But such resulting trust can only be enforced by bill in equity in favor of the heir, &c. (*Finlay et al.* v. *King's lessee*, 3 Peters' R. 383. *Doe* v. *Copestake*, 6 East, 328.) There is a distinction between conditions in law and a limitation. An estate, given so long as one pays rent, ceases upon the non-payment of the rent ; but express words must be used in such cases. So an estate, liable to be defeated by a future contingency ; if the words are mere words of contingency, they are construed words of limitation ; and upon the happening of the contingency, the first estate ceases. And where a fee is once given, and the limitation over is void, the estate of the first taker becomes absolute. The case here is to be considered in the same manner as if there had been no devise to the Orphan Asylum, and that upon the death of the child, no disposition of the estate had been made.

The co-executors of the complainant are not necessary parties to the bill. The complainant is in sole possession. The same objection was made against entering the appeal to the court of errors in the case of *M'Cartee* v. *The Orphan Asylum*, and was disregarded. Nor is it necessary that the *cestuys que trust* should be made parties ; the trustee may bring the suit in his own name. The party is not required to state the nature of his claim, where he spreads out in the pleadings all the facts upon which it is founded. The complainant has shown enough to entitle him to the aid of the court. He has a legal estate in the premises ; and a party who can defend his possession successfully, has a remedy in chancery. The complainant

is entitled to an injunction, because two suits are brought by the widow in relation to the same subject matter ; one in equity and one at law. And the jurisdiction of this court having attached, it will stay the proceedings at law.

The complainant relies with confidence upon the marriage articles which were executed by Mrs. Teller previous to her marriage, with the assent of her guardian, as an equitable bar to the claim of dower now asserted ; whilst on the part of the defendants it is insisted that they are absolutely void, upon one or more of the following grounds : 1. Because Mrs. Teller was an infant at the time of her coverture ; 2. Because the provision made for her is not charged on a freehold estate, so as to be capable of specific execution as a legal jointure : and 3. Because the provision is in itself unreasonable and uncertain. That the statute of jointures embraces infants as well as adults, so that a settlement before marriage, otherwise valid, cannot be set aside on the ground of the infancy of the wife, at the time of its execution, or of the marriage, was definitively settled in England, by the decision of the house of lords, reversing the decree of Lord Northington, in the great case of *Drury* v. *Drury.* It may be true, as Mr. Eden, (the grandson of Lord Northington,) has asserted, that great doubts have been entertained as to the propriety of this decision, but that its controlling force, as an authority, has ever been questioned is not pretended ; on the contrary, Mr. Eden expressly admits that by this decision the important question which it involved was finally settled. That the law of that case is, and for more than half a century past, has been the law of England, it is impossible to doubt ; and such being the fact, no stronger proof could well be given of the difficulties of the defendant's case than the attempt of the learned counsel to shew that it is not also the law of this country. That it was a deliberate and solemn determination, by the court of ultimate jurisdiction, of the very question under consideration, is not denied ; but the learned counsel are dissatisfied with the reasoning on which it proceeded, and considered the arguments of Lord Hardwicke and Lord Mansfield as weak and unsatisfactory. We think there would be no difficulty in repelling these strictures, and

in vindicating the opinion of these illustirous men from the censures of the learned counsel ; but we have no courage for such a discussion, and shrink from the presumption which such a vindication would imply. We content ourselves with saying that, in our judgment, the question, whether the decision of the house of lords was properly made, is not open for the consideration of this court as such. That decision was pronounced in the year 1762. From that time it became the law of this state, as a colony. It continued so to be the law when we became an independent state ; it has never since been changed by the legislature ; and with entire respect, we deny the authority of this court to change it now. We submit, with great confidence, that a decision of the house of lords before the revolution is as conclusive evidence of the law, and as such is binding upon the conscience of this court, as any recent decision of our own court of errors.

The authority of *Drury* v. *Drury*, (2 Eden, 60,) being admitted, there is an end, it seems to us, of all questions as to the validity of the marriage articles, as an equitable jointure. The two cases, in all essential circumstances, are absolutely similar ; nor is it possible to state a distinction between them, which a slight examination will not show to be groundless. The learned counsel are exceedingly mistaken in the assertion that the only question decided by the house of lords was, that the infancy of the wife is no objection to a jointure under the statute. The provision for the wife in *Drury* v. *Drury* was not a legal jointure ; it was not a settlement of such an estate in lands as the statute requires, or indeed of any estate at all. It was a mere covenant, on the part of the husband, binding his heirs, executors, &c. to pay to his wife, after his decease, a certain annuity, during her life, in lieu and satisfaction of her dower. It is very clear that such a provision could not have been pleaded in bar to an action of dower, and that, from its nature and character, a court of equity was alone competent to give it effect. It is true that the sole question on which the opinion of the judges was required, related to the construction of the statute, and for this plain reason, that, as equity follows the law, if it were held that a legal jointure is valid, notwithstanding

the infancy of the wife, the same rule would be adopted in equity, in reference to those provisions intended as a satisfaction of dower, which, as not embraced by the terms of the statute, it is the exclusive province of that court to enforce.

The decision of the house of lords, therefore, was, 1. That the statute extends to infants as well as adults ; and 2. As a consequence of this, that the infancy of the wife was no objection to an equitable jointure, otherwise valid.

His honor, the vice chancellor, in his written opinion, does not deny that the provision for the wife in *Drury* v. *Drury* was an equitable jointure, and that its validity as such was the question determined ; but between that case and the present there exists, he asserts, a distinction so material as to render it quite inapplicable as an authority. He says that, in *Drury* v. *Drury*, the covenant of the husband charged his estate with the payment of the annuity, and that the house of lords evidently adopted this construction of the articles, " since they made a specific decree to that effect ;" whereas, in the present case, the agreement of the husband " is a naked covenant to pay, and is not, therefore, such a covenant as would enable the court to compel the heirs to make such a provision as the statute requires, and consequently is not valid." His honor, therefore, means to decide that an equitable jointure, where the wife was an infant, is not valid, unless it be so charged upon the lands of the husband, that upon his death, the wife may compel the heirs to convey to, or settle upon her such an estate in the lands as the statute requires ; in other words, to convert the equitable provision into a legal jointure ; and he evidently supposes that such were the terms and import of the decree in *Drury* v. *Drury*. On this subject, (we speak with much respect,) the learned judge was probably misled by the observations of Mr. Roper, to which he refers. It is plain that Mr. Roper was much dissatisfied with the ultimate decision in *Drury* v. *Drury*, and was anxious to confine its authority within the narrowest limits. He was thus led to give a construction to that case which is not justified, either by the reasoning of the counsel, the opinions of the judges, or the terms of the decree ; which

is not sanctioned by a single case, or even dictum of a judge; and which is directly repugnant to numerous authorities.

It is not necessary to the validity of an equitable jointure, that it should be charged upon lands at all; and this is conclusively shown by the authorities to which Lord Hardwicke refers, (2 Eden, 66, 7, 8,) and by many cases that have since occurred. (See Clancy, Hus. & Wife, p. 223, a. 227; *Corbet* v. *Corbet*, 1 Sim. & Stu. 612.) The general rule is that which Mr. Clancy states: That a court of equity will execute any terms " for a married woman, without regard to the nature of the property, as out of trust estates, leasehold, copyholds, or out of the funds, and hold them to be a bar of dower, if the intention appears to have been such." (Clancy, 223.) Nor is the provision for the wife rendered insecure or precarious, because it is not made a lien upon the lands of the husband, nor any specific fund set apart for its satisfaction, since, if the property left by the husband is insufficient for that purpose, this would in equity be considered an eviction, and the widow would be remitted to her dower. She cannot therefore be injured, since she is certain either to have the intended provision made good out of the estate of her husband, or to be restored to her dower; and this is one of the reasons given by Lord Hardwicke himself, in *Drury* v. *Drury*, in support of his opinion, (2 Eden, 68.)

That the law is as we have stated in the case of adults, the vice chancellor admits, but he denies that it extends to infants. He admits that in two cases to which he had been referred on the argument, and in which an equitable jointure, not charged on freehold estate, was held to be a bar of dower, the wives were infants; but for reasons which we frankly confess appear to us very singular, he entirely rejects the authority of these cases, and dismisses them with the observation that "they are too bald to afford satisfactory ground for shaking a fundamental rule of law." This last observation seems to us somewhat perplexing. What is the fundamental rule of law to which his honor refers? Does he mean the rule that the contracts of infants are not binding? This can hardly be; for this rule, so far as it applies to a

settlement, legal or equitable, in bar of dower, on an infant feme, is not merely shaken, but overturned by the decision in *Drury* v. *Drury*, the authority of which his honor himself professes to admit. Does he then mean that it is a fundamental rule of law, that an equitable jointure on an infant is not valid, unless so charged upon lands as to be capable of specific execution as a jointure under the statute? If so, where, we would ask, is this rule to be found? Where is the evidence that it exists at all? In what case was it established? We produce two express decisions in which this supposed rule was entirely disregarded, and its existence denied. Can a single one be produced in which it was followed? His honor says that "the case of *Jordan* v. *Savage*, which he cites from 3 Bac. Abr. 717, is imperfectly reported. We perceive no imperfection in the report of the case in 2 Eq. Ab. 102. The reasons of the chancellor are not indeed given *in extenso*, but there is a clear and explicit statement of the material facts, and of the points decided. It is remarkable that this very case, which his honor treats as of no authority, is one of those on which Lord Hardwick, in *Drury* v. *Drury*, placed his main reliance. (2 Eden, 66.) He even seems to have taken pains to show that the decision was entitled to peculiar weight, from the eminent abilities of the chancellor, (Lord King,) by whom the decree was made.

We find it still more difficult to acquiesce in the reasons of the vice chancellor for disregarding the case of *Williams* v. *Chitty*, (3 Ves. jun. 545,) which seems to us to possess all the requisites of an authoritative decision. In that case, the settlement intended as a jointure was of leasehold property and of stocks, and if valid, it was admitted that the freehold estates of the husband were entirely discharged. Upon the death of the husband, the widow claimed her dower, upon the ground that she was an infant at the time of the settlement, and this claim was resisted by the children. The master reported that the widow was not entitled to her dower; in other words, that she was bound by the settlement. To this report she excepted, and the exception was argued in her favor by the most eminent counsel of the day, who, upon

several grounds, (one of which was that the settlement did not bind all the lands,) sought to distinguish the case from that of *Drury* v. *Drury.* After stating their argument, the reporter says that the lord chancellor was satisfied that the widow was under age at the time of the settlement, " but disallowed the exception, without hearing the counsel for the children on that point." The reporter adds: " He also thought the second question," (which related to another point,) " very clear."

In the opinion of the vice chancellor this case deserves no regard, because " the reasons of the chancellor are not given, and his opinion is only implied by his overruling the exception." We do not understand this; it would be as reasonable to say that the opinion of a court of errors is only implied by their affirmance of the judgment of the court below. It is upon exceptions to a master's report that the vital questions of a cause frequently arise and are finally decided ; and the disallowance of an exception, it seems to us, is an express declaration that the exception is wrong, and the report is right. True, the chancellor gave no reasons, and it is evident, that he deemed them unnecessary ; but it is a strange and novel ground for denying the authority of a decision, that the points decided were deemed by the court too clear to require argument or discussion. The reasons, however, of the chancellor, are evident on the face of the report. The great effort of the counsel for the widow was to distinguish the case from that of *Drury* v. *Drury.* The chancellor must have thought the cases not distinguishable ; in other words, the distinctions on which the counsel relied, were in his judgment immaterial. The truth is, the case of *Drury* v. *Drury,* was meant to establish the general rule, that as the infancy of the wife does not affect a legal jointure, so it forms no objection to an equitable provision, by way of jointure, which is otherwise valid. Upon any other supposition, a large portion of the reasoning, both of Lord Hardwicke and Lord Mansfield, and most of the authorities to which they refer, would be inapplicable. If this rule is to be understood with the limitation which the vice chancellor supposes, it lies upon the

1831.

M'Cartee
v.
Teller.

defendants to show how and when the exception was intro-
duced and established.

There is no difference whatever, in their legal operation
and effect, between the covenant of P. Jacobs in the present
marriage articles, and the covenant of the husband in *Dru-
ry* v. *Drury.* That, like the present, was a general cove-
nant to pay, and neither created nor professed to create a
specific lien on any portion of the estate. It was not pre-
tended on the argument that it was susceptible of any other
construction; still less, that it enabled the court to convey,
or to compel the heirs to convey to the wife such an estate
in lands as the statute requires, nor can we imagine the
source of the error, into which the vice chacellor has fallen,
when he says that a " specific decree to that effect was actu-
ally made by the house of lords. The report in Eden omits
to state the decree; but in Brown's parliamentary reports, (3
Bro. P. C. Toul. ed. p. 502, 3,) it is given verbatim, and
seems to have been drawn with great care and accuracy. It
directs in substance that so much of the personal estate of Sir
Thomas Drury should be set apart, and vested in trustees,
as would be sufficient to secure to his widow the annuity of
£600, to which she was entitled under the articles; and
further, that after one of the appellants, named in the decree,
(probably the youngest child,) should attain the age of twen-
ty one years, the widow should be at liberty to apply to the
chancellor to have the annuity charged upon, and secured
by, and out of the real estate of the said Sir Thomas."

We perceive no mention here of any such conveyance or
settlement of a legal jointure as the vice chancellor assumes
to be necessary, and as we understand him to say was actually
directed; all that the decree proves is, that in the opinion of
the court, the real as well as the personal estate of Sir Thom-
as Drury, was liable to make good to his widow the provis-
ion to which she was entitled, and might be applied, in the
discretion of the chancellor, for that purpose. And can it
be doubted, we would ask, that all the property, real as well
as personal of Philip Jacobs, at the time of his death, was
equally liable to make good his covenant? And if his widow
had not forfeited her annuity by her subsequent marriage,

can any reason be given why this court might not make a decree, in substance, the same with that in *Drury* v. *Drury*, for securing to her its punctual payment? It is true that in England this decree could not have been made, had not the court adopted the opinion that the husband, by his covenant, intended to charge or bind his land, and, for the sake of the argument, let it be admitted that the present marriage articles contain no evidence of such an intention. The answer is obvious. It is not necessary in this country that such an intention should appear on the face of the agreement. The law supplies the defect, and by its general provisions creates and imposes that charge upon land, which, in England, so unreasonably depends upon the will of the party. It happens however that the covenant of Philip Jacobs would be sufficient to charge his lands even under the law of England, and its terms are in that respect far less equivocal than those of the agreement in *Drury* v. *Drury*. His covenant is, that the annuity should be paid out of his estate, thus treating his whole estate as a fund for its satisfaction. It is well settled that these words mean all the estate, real as well as personal, and if in a devise they are sufficient to render the lands liable for the debts, we see no reason why the same construction should not be given to them in a covenant. It thus appears in the result, as we stated in the commencement, that between this and the case of *Drury* v. *Drury* there is not a semblance, a shadow of distinction.

It is next insisted that the marriage articles are not in this case a bar of dower, because the provision intended for the wife is uncertain and precarious, inasmuch as it is liable to be forfeited by her acts during the coverture. This objection is also considered by the vice chancellor as fatal, and it is made by him one of the grounds of his decree. We trust the following observations will be deemed a satisfactory reply.

1. We admit that an equitable jointure to be valid must be certain, and, (to adopt the language of the defendants' counsel,) "that it must vest in possession or profit immediately from the death of the husband;" but we insist that this condition is fulfilled in the present case, since by the terms of the

articles the widow was to be entitled to the annuity from the death of the husband ; in other words, her interest vested on his death. The question therefore is, what is meant by a certain provision? or more properly, what is the nature of the uncertainty which renders a provision in lieu of dower so precarious as not to be binding on an infant ?

. The leading case on this subject, is that of *Caruthers* v. *Caruthers*, (4 Bro. C. C. 499 ; and we refer to it as a decision which illustrates very clearly the meaning of the rule. The settlement, intended as a jointure, was of an estate for life, to the widow ; but this, from the terms of its creation, was not to vest on the death of the husband, but on the expiration of another life estate granted to a third person in the same premises. It was uncertain therefore from the nature of the estate, not only whether it would vest in possession on the death of the husband, but whether it would vest at all, since its doing so, depended on the contingency of the wife's surviving the intermediate tenant for life, who, in point of fact, it appears from the report, was still living at the death of the husband. The settlement as a bar of dower was declared void, and the sole ground of the determination was the uncertainty that we have pointed out. .The emphatic words of the master of the rolls are " *non constat*, that the estate will ever be hers, (the widow's,) in possession."

The rule as deducible from this and the subsequent case of *Smith* v. *Smith*, (5 Ves. 189,) is therefore this, that a jointure, legal or equitable, is void for uncertainty, when, from its nature, it is doubtful whether it will ever take effect in possession ; that is, when its vesting depends on a contingency independent of the will of the party.

We submit, however, with entire confidence, that such an estate or provision is not uncertain, because it may be avoided or defeated by the acts of the wife herself. It is not uncertain, because she may prevent it from vesting, or determine it when vested, for the loss of the jointure is, in such cases, her own fault, and does not result from the contingent nature of the estate itself. Thus, it is well settled that an estate, *durante viduitate*, is a valid jointure, even under the statute, (Vernon's Case 4, Co. R. 2 ; Dyer, 317, A. S. C.)

for it is an estate for life, unless the widow chose to determine it. The annuity, in the present case, is of this character ; but neither the vice chancellor nor the counsel has stated this as an objection. We apprehend, however, that an estate, during the widowhood of a third person, would be clearly void, and even if so limited as to vest in possession on the death of the husband, it would still be void, from the uncertainty of its continuance. Yet the only difference is that the duration of the wife's estate depends, in the one case, on her own will, and not in the other ; and this observation is sufficient to show that there cannot be much force in the distinction taken by the defendants' counsel, between a condition for avoiding the jointure during the coverture, and one by which it may be subsequently defeated.

The vice chancellor, however, thought otherwise, for it is upon this distinction he seems to have laid the stress of his opinion. After declaring the provision to be void, from the uncertainty of its taking effect on the death of the husband, he adds, "that no case can be found to sanction the principle that a jointure may be defeated by an act previous to the death of the husband." The learned counsel goes still further, for he not only declares that no such case is to be found, but "that it is impossible that such a decision can be made."

Now let it be admitted that no express decision on this point is to be found ; that such conditions have been frequently inserted in marriage settlements, it is hardly possible to doubt, and the absence of cases may therefore be owing to the fact, that no counsel has deemed it expedient, on this ground, to question their validity. In this, as in many other instances, because there is no case, it does not follow that such is not the law ; but that upon principle, the law was deemed so clear, that it would be fruitless to deny it. Recurring then to principles, is there any difference in reason and good sense, so far as this question is concerned, between a condition precedent and subsequent ? A condition to prevent the estate from vesting, and one by which it may be subsequently defeated ? The objection in both cases is, that the condition renders the jointure uncertain ; but whether

the condition be precedent or subsequent, that uncertainty equally exists, and the answer, therefore, which is admitted to be conclusive in the one case, must be equally so in the other ; namely, that the jointure is not uncertain, unless the wife chooses to defeat it. It is certain, if she wills that it shall be.

But although there may be no adjudged case to sanction the principle that a jointure may be defeated by the acts of the wife during the coverture, it so happens that the principle is sanctioned by a much higher authority—that of the legislature itself. It doubtless escaped the recollection of the vice chancellor that the 11th section of the statute contains an express provision that the consent of a married woman to her ravisher works a forfeiturte of jointure as well as of dower. (1 R. L. 59.)

Again ; the adultery of the wife is, and for centuries past, has been a forfeiture of dower ; but until the late revision of the statutes, the forfeiture did not, by law, extend to a jointure, yet it cannot surely be doubted that a condition to that effect would have been valid in a marriage settlement, since it will hardly be pretended that a jointure must be even more certain than the dower which it is intended to bar. If we are not greatly deceived, it will be found, by looking at the precedents, that this is a usual provision in marriage articles. These observations are sufficient to show that there is no such general rule, as is inserted, that a jointure cannot be valid where it is liable to be defeated by the acts of the wife, during the coverture. Whether it may not be rendered void, in some cases, by the peculiar nature of the conditions annexed, is a different question. The condition, which is made a special ground of objection in the present case, is that which restrains the wife from contracting any debt to the amount of $20, during the life of her husband, without his consent, and for which he might be made accountable. It is said that this condition is unjust and unreasonable, and that the provision which is made to depend on its observance is consequently void. We deny both premises and consequence.

The condition is not unreasonable, if it be reasonably interpreted. We apprehend that no court would construe it as restraining the wife from the purchase of those necessaries which the husband might omit to supply, and which her own condition, or that of her family might require. It is not correct to say that the condition must extend to necessaries, because, for these only could the husband be made accountable. The husband, by sanctioning the debts of his wife, even for necessaries, may frequently give her a credit, the limits of which it is difficult to fix, and which it is in her power greatly to abuse. It was to prevent an abuse of this character, we cannot doubt, that the provision was introduced; and thus interpreted, it seems but a fair and reasonable check on the probable extravagance of a young woman, who, by her marriage, was to be raised to sudden affluence from a state of absolute poverty. It was doubtless thus understood by the guardian, whose peculiar duty it was to watch over the interests of his ward, and who signed the articles in her behalf.

Admitting the condition to he as unreasonable as the counsel insist; admitting, that from its nature, a breach was almost certain, and therefore that, morally speaking, it was impossible to be perfomed, or that it imposed a restraint inconsistent with the relation of husband and wife, and with the rights and duties flowing from the marriage contract; what is the consequence of those admissions? Not, as we apprehend, that the provision is dependant on the condition, but that the condition itself would be void. Such is the general rule, where the condition annexed to a grant, gift, or estate of any kind, is impossible, inconsistent, or illegal ; (*Brown* v. *Peck*, 1 Eden, 140 ; *Bradley* v. *Peixotto*, 3 Ves. jun. 324 ;) and no branch of equity jurisdiction is better established than that which enables the court in such cases to relieve against a forfeiture. To sum up briefly the argument on this part of the case : If the condition was fair and reasonable, then it was the duty of the wife to perform it, and if she incurred a forfeiture by a breach, the loss of her equitable jointure was to be imputed to her own fault, and not to the uncertainty of the provision itself. If the condition was

unreasonable and illegal, then the court of chancery, if applied to, would have secured to her the annuity, discharged of the condition.

Supposing the marriage articles to be an equitable bar, the next inquiry is whether the widow's right of dower was revived by the will of her husband, P. Jacobs. Did Philip Jacobs, in his will, intend to restore to his wife her right of dower, so as to give her an election to take either her dower, or the annuity under the articles, or the gross sum of $6000 in lieu of both ? His right to do this is not disputed ; and if the will affords evidence that such was his intention, that intention must prevail. We deny that the will is fairly susceptible of this construction.

When we look at the extent and value of the testator's real estate, we see at once that it is in a high degree improbable that he could have intended to give to his widow the election which is supposed. He could not be ignorant that the dower would very greatly exceed in value both the annuity under the articles, and the pecuniary bequest of the will, and consequently that it would be certainly taken, if the right to take it were given. Where an election is given there always is, or is supposed to be, such an equality in value between the different objects, as to render doubtful the ultimate choice. To give an election between a legacy of $3000 and one of $1000, or between an estate for life and the fee in the same lands, would be absurd. The absurdity would be almost as striking in the present case, and therefore the construction which involves it ought not to be adopted unless necessary.

That such is the necessary construction of the will is not pretended. Even the learned counsel speak only of implication, and the implication, if it exists, is remote and doubtful. The testator bequeathed to his wife $6000, " in lieu of all dower to which she might be by law entitled, and also in lieu of the marriage articles ;" and he then directs that if she accepts the bequest the marriage articles shall be cancelled, and she shall execute a release of her right to dower. Now, giving to this language all the force of which it is susceptible, it goes no farther than to show the opinion

1831.

M'Cartee
v.
Teller.

of the testator, that possibly the right of dower might still subsist, but certainly evinces no intention to revive it, if barred. On the contrary, so far from shewing that the testator meant that in any event his widow should take her dower, it is his evident design that all claims to it on her part should be finally extinguished. The peculiar phraseology of the will is susceptible, however, of a different and still more satisfactory explanation. The legal right of dower still existed, for the marriage articles created only an equitable bar.

It is therefore true, that the widow was by law entitled to her dower; and to put an end even to possible litigation, a release was very properly required. Again; if the $6000 were accepted, the marriage articles were to be cancelled; but it was by these articles alone that the widow was barred of her dower. If they were cancelled, it was probably thought that her rights in equity, as well as at law, would be revived, unless it was expressly declared that the acceptance of the bequest should have the same effect as the articles themselves. The provision, therefore, that the bequest was " to be received in lieu of all dower," though perhaps unnecessary, was inserted *ex majori cautela*.

The next clause of the will, (which is in truth a part of the same paragraph,) removes even a possible doubt as to its true construction, and the real intentions of the testator. It is in these words: " And it is my further will, that my said wife shall make her election to take under this, my last will and testament, or under said marriage articles, in thirty days after she may receive notice of this bequest, after my decease."

What is the widow, if she elects, to take under the will? Clearly the bequest, that is, the $6000, of which she was to receive notice; for it would be absurd to suppose that the testator meant she might elect to take under the will both the legacy and her dower, when the one had been expressly declared to be in lieu of the other. The widow's election is therefore, in terms, confined to the pecuniary bequest and the provision of the marriage articles, so that all supposition that the testator intended that in any event she might take her dower, is excluded.

It is .next insisted that the complainant has waived the marriage articles, and that his acts, in effect, amount to an assignment of dower, by which he is concluded. The two questions of waiver and assignment are in themselves distinct, and will with most convenience be separately considered.

There is no dispute as to the principal facts on this part of the case. It is certainly true that the complainant, shortly after the death of the testator, believing the marriage articles to be invalid, admitted the right of the widow to take her dower; that he concurred with her in some legal proceedings, in which her right of dower, though certainly not decreed, was recognized; and that, for some years in succession, he paid to her a portion of the rents received by him from the real estate of the testator, on account of her dower; but we deny that by any, or all of those acts, the marriage articles were, or could be waived, so as to restore the widow to the rights which they were intended to bar; because the complainant was acting as a trustee under the will of Philip Jacobs, and Mrs. Teller had full notice of the trust. His first act of recognition or acquiescence was shortly after the death of the testator, and during the life of the child, and even the last payment of rent was long before it had been decided that the express trusts of the will had ceased. It is well settled that the legal effect of the transactions of a trustee, with a person who has notice of the trust, depends exclusively on the powers of a trustee as such. If the acts are authorized by the trust, they are valid; if otherwise, they are void; nor is the person chargeable with notice ever permitted to allege their validity. The widow knew that the complainant was a trustee, and dealt with him as such. She knew of the will of her husband, and that the complainant was acting under it. She knew, therefore, that it was not in his power to give her any rights in the estate of her husband, which she did not already possess, and that his recognition of her claims could only be valid so far as the claims themselves were just. If she received the rents on

account of her dower, knowing that she was not entitled, she was guilty of a fraud. If she, as well as the complainant, acted under a mistake as to her rights, then it is her duty to unite in correcting the error, as soon as discovered; for it would be as fraudulent in her to retain the monies after such discovery, as it would have been to receive them originally, knowing that she was not entitled.

Now what is the answer of the defendants' counsel to these positions? Do they deny the law to be as we have stated? No; but they assert that the "complainant ought not to be considered a trustee; that he claims the property as absolute owner, and therefore ought to be bound by his own acts. With much respect to the learned counsel, we must be permitted to say that, in our judgment, these assertions are not simply gratuitous, but directly opposed to the evidence before the court. The express trusts of the will, it is true, have ceased; but it does not therefore follow that the complainant's character of a trustee has ceased, or that he has in this, or any other suit, ever set up such an allegation. There is still a resulting trust for the heirs at law; and whether there are, or are not any persons to enforce the execution of the trust, neither is, nor can be known to this court. So far as is known to the court, the complainant is, and always has been, acting in the plain exercise of his duty as a trustee, in defending and preserving the estate for the benefit of those who may be finally entitled.

The acts of acquiescence and recognition, on the part of the complainant, took place under a mistaken view of his rights and duty as a trustee, and cannot, therefore, in equity, be alleged against him. It is a mixed case of ignorance of fact and of law; for, although he had notice from the will of the existence of the marriage articles, he had no knowledge of their contents, and acted under a false opinion of their invalidity. It is a novel doctrine to us, that a person may not be relieved in equity, on the ground of ignorance of his legal rights; and still more so, that he is to be concluded by admissions which such ignorance could alone have prompted. The cases are numerous in which even the most

solemn acts, such as releases and conveyances, have been set aside on the single ground that the party executing was ignorant of his legal rights ; (1 P. Wms. 259 ; 3 id. 315 ; Mosely, 364 ; 1 Ves. 567 ; 2 id. 310 ; 2 Mer. 354 ; 1 Mad. 60 ;) and whatever doubts may have been entertained in some of these cases, till now it has never been supposed that the mere admissions of a party, under such circumstances, could be relied on as creating or establishing a right not before existing.  The case of *Storrs* v. *Barker*, (6 John. Ch. R. 166,) does not conflict with the authorities we have cited. It merely shows that a party is not permitted to allege his own ignorance, in order to defeat an equitable right which he has himself created.  That doctrine has no application here.  If the marriage articles are valid, there is no equity in the widow's claim.

The acts of the complainant are not a waiver of the marriage articles, because a contract of this description, and under seal, could not be released by parol, and because an estate, legal or equitable, in lands, cannot be created by parol, with the exception of some cases of a resulting trust. The marriage articles extinguished, in equity, the widow's life estate, to which, as her dower, she would have been entitled.  All that she retained was a naked legal title ; the whole beneficial interest was gone.  We submit that she could not re-acquire the interest thus lost, unless by the devise of the husband, or a re-conveyance after his death, from them in whom the beneficial interest was vested.  Even a conveyance from the trustees could not have had this effect, since it would have been void on its face, as a manifest violation of their trust.  To hold, therefore, that the marriage articles are set aside by the subsequent acts of the complainant, would be to give to these acts the effect of passing to the widow an estate in lands of which she was not before possessed ; thus making the acts *in pais* of a single trustee of more efficacy than a conveyance executed by them all.  And lastly, admitting that it was competent to the trustees to waive the marriage articles, as such waiver would necessarily impair their joint title, the consent of all would clearly be requisite ; as much so to a waiver as to a conveyance.

Passing the question of waiver, it is next insisted that the acts of the complainant amount to an actual assignment of dower, and many authorities are cited to show that such an assignment once made is conclusive. We do not deny that an assignment of dower may be made by parol, and that rents may be assigned as well as lands, but certainty is essential to the validity of every assignment, whether by writing or parol, of land or of rents ; and by this we understand to be meant, that the lands or rents assigned shall be clearly defined and specified, so as to give the widow a plain title to the possession of the one and the receipt of the other. To assign dower, is to put the widow in possession of it. The assignment is a satisfaction of her claims, and bars her rights in all property not included in the assignment. The assignment must therefore be certain and notorious, in order to afford adequate protection to the terre-tenatns of the lands which it does not embrace.' There can be no difference, in this respect, between an assignment of rents and of lands. The lands out of which the rents are to arise, and the rents which she is to receive, must be specified. The assignment must give her an estate in the rents as in the lands, and must therefore create such a privity between her and the tenant, as to enable her to enforce the collection or recovery of the rents, to which she is entitled in her own name, and as her own property. An agreement, therefore, not of the tenants, but of the heir or other owner of the lands, that he will pay to the widow a certain proportion of the rents, to be received by him, is no assignment, for it creates no privity, and gives her neither possession nor title to either the lands or the rents. A contrary doctrine, it is obvious, would be most prejudicial to the widow herself. Since an assignment is of itself a satisfaction, the widow would lose all remedy against the lands, and be compelled to rely on the sole responsibility of the person with whom the agreement is made. Such an agreement, so far from being an assignment, is in truth directly the reverse ; it is an arrangement to prevent an assignment, and a consent on the part of the widow not to enforce it so long as the agreement is performed. If these remarks are correct, their applica-

tion to the facts of the case is obvious and conclusive. There has been no specification of lands or rents ; no privity created ; no change of possession or of title ; so that the pretence of an assignment falls to the ground. In addition to the authorities cited by the defendant's counsel, we refer the court to Co. Litt. 34 b. 35 a.

Again ; we deny that an assignment once made is conclusive in the sense in which that rule is understood by the defendants' counsel. It is doubtless true, that where the right of dower is certain, the propriety of the assignment once made cannot afterwards be questioned ; but it does not appear from the authorities to which the counsel refer, or any other, that the title itself may not be questioned, or that a party having made an assignment may not be relieved, where he can show that no title existed ; and the authorities, we suspect, must be very clear and decisive that are to obtain the sanction of this court to such a doctrine. We speak with some confidence that there is no case to prove that an assignment, of itself, creates a title where none before existed ; on the contrary, the first resolution in *Vernon's case*, (4. Co. R.) seems to establish the opposite doctrine. It was there decided that an assignment must be of lands of which the widow is dowable ; thus, as we understand the case, clearly making the validity of the assignment dependant on the right. See also the case of *Turner* v. *Sturgess*, (Dyer, 91 a.) Suppose an assignment by the heir, in ignorance that the widow was barred by a settlement ; or by a purchaser, not knowing that she had released to the heir, or that other lands had already been assigned in full satisfaction ; or by either to a person not in fact the wife, or who had forfeited her right by living with her adulterer ; according to the doctrine of the counsel, an indefeasible estate for life would thus be acquired without conveyance, and the sources of the title would be fraud on the one part and ignorance on the other. We deem it unnecessary to pursue the argument further.

If the widow can be restored to her election to take under the will the pecuniary bequest of $6000, it can only be done according to the established principles of equity, on the con-

dition that she account for the monies she has already received. Strictly speaking, she has no right to the intended bounty of the testator, but has lost her title by her neglect to assert it within the period which the will prescribes. If she is relieved against the forfeiture, it can only be on the ground that she, as well as the complainant, acted in ignorance of her rights, and omitted to claim the legacy because she thought herself entitled to dower; but if she is to be relieved from the consequences of this mutual error, so must the complainant be. If she asks equity, she must do equity; she can claim no more than to be placed in the same situation in which she would have been, had she elected to take the bequest within the 30 days which the will appointed, when she would have received from the estate $6000, and no more; but she will be placed in a much better situation, if this sum is to be decreed her now, and she is also allowed to retain the monies she already has. This will be not to fulfil but to defeat the intentions of the testator, by giving her from the estate a much larger sum than he meant she should receive. Whether monies voluntarily paid under a mere ignorance of law are recoverable, is not the question. The complainant is not seeking such a recovery; but can the widow conscientiously claim to recover the whole legacy, without a deduction of those monies which she has already received from the testator's estate, and to which she had no title? And, if she applies to the equity of the court, must she not submit to the rules which equity and conscience prescribe? If the widow take under the will, she must perform the will; if she claim the testator's bounty, she must do so within the limits that he has prescribed.

*R. Bogardus & D. B. Ogden*, for the defendants. If there be any doubt which way the decree ought to be, the complainant is not entitled to an injunction; and if, for any reasons, the injunction should not be granted, the decision of the vice chancellor ought be affirmed. The complainant cannot file his bill, unless he shows some right to the property in controversy; and he must state that interest with precision. Mitf. Pl. 40.) None is shown here. If he has any, then Anthon

and Cunnyngham, his co-executors, have an equal and joint right with him, and should have been made parties to the bill.

Here the trustees have no interest under the will; in no event were they to be the objects of the testator's bounty. Provision was made to compensate them for their services. The fee vested not in them but in the unborn infant. All the right they have, is to receive the rents and profits, and apply them according to the direction of the will. The intention of the testator was that the fee should vest in the Orphan Asylum, and to divest upon the birth of the child; and if the child died, then the devise of the fee was made by the will direct to the Orphan Asylum. If there is any devise to the executors, it is contained in the clause devising the estate to them, subject to the trusts declared in the will; and as there were no trusts, it was not necessary to give them the fee, merely to collect and apply as directed the rents and profits. The authority given to executors to sell does not carry a fee. The true construction of the will is, if the child is to be considered as such in the womb, that it vested the fee, either in the child, or, if not in the child, then in the Orphan Asylum until the birth of the child. If the child was born and lived, the executors were only to have an authority to sell. The question in the court of errors was, whether the executors held in trust, or whether the devise was direct to the Orphan Asylum. Chancellor Jones held it was a trust, and directed a conveyance to the Orphan Asylum. The court of errors decided that it was a direct devise to the Orphan Asylum, upon the death of the child. If so, there was an end of the trust in the executors. The testator intended the fee should vest in the Orphan Asylum upon the death of the child under twenty one; and the Orphan Asylum not being competent to take, the fee descends to the heirs at law, like all property undevised, and in like manner as if no devise had been made; but the estate does not go to the heir as a resulting trust. The mistake of the counsel for the complainant is in supposing that the executors ever had a fee at all.

The contract made before the marriage, between Philip Jacobs and the complainant, Elizabeth, is not a settlement,

nor a jointure, within the act, either legal or equitable, so as to bar dower, unaccepted by the widow after the death of the husband. And if such a contract would bar an adult in her intended husband's estate, it will not bar the widow, she being an infant at the time the contract was made. (1 Cruise, 195, ch. 1, and the authorities referred to. 1 Roper, Hus. & Wife, 473, 476, 480, 485.) A marriage contract will neither bind an infant, nor a feme covert. Whether a jointure, settled upon a married woman under age, was within the act of 27 Hen. 8, was the question in the case of *Drury* v. *Drury*. There, a majority determined that it was, if all the requirements of the statute were complied with. That, however, is a balanced case; it was decided in 1762. The law since upon this point has not been considered as settled. In the case of *Wilson* v. *Lord Harewood*, (18 Ves. 275,) it is stated by the lord chancellor that Lord Thurlow expressed himself in favor of the opinion given by Chancellor Northington, in the case of *Drury* v. *Drury*, which was against the validity of such a jointure. This court is not bound by that case. The house of lords considered the question as effecting the keeping up of families. Chancellor Northington considered it as one of right and wrong. All the authorites, since the decision in *Drury* v. *Drury*, (2 Eden, 60,) are against an infant's being bound by articles in relation to her own estate, not confirmed by her after twenty-one. The case of *Drury* v. *Drury* was decided as a mere jointure under the statute. Before the statute of 27 Hen. 8 was passed, great difficulty was experienced in barring estates of dower. Uses and trusts were invented to accomplish this object. The case of *Drury* v. *Drury* is not an authority beyond the case where the jointure of the infant is secured upon a freehold estate, or where the wife has the right to have it so settled. (1 Roper, Hus. & Wife, 473.) It is a settled rule that no woman under age can absolutely bind herself by a contract or agreement to part with her freehold estate, or her interest in another's freehold property; and title to dower falls within this rule. (1 Roper, Hus. & Wife, 477, 479, 480, 2.)

The complainant having become the agent and receiver of the widow in collecting and paying over to her a share of

the rents, cannot now dispute her right to the same. All within the consideration of a marriage contract, and none others, can set it up. (*Bradish* v. *Gibbs*, 3 John. Ch. R. 523, 550. *Osgood* v. *Strode*, 2 P. Wms. 255.) The complainant, not being within the consideration, cannot set up the contract in bar of the widow's dower. And the court has a right to presume that the widow was induced to re-marry by the complainant's statement to her that she was entitled to dower, by which re-marriage she forfeited her annuity ; and to permit the complainant now to set up the marriage contract against her, would be permitting him to commit a fraud upon her.

It is by no means admitted, if the contract in its inception should have been binding, that the parties could not waive it ; nor do we understand the counsel as contending that such, or any other contract, cannot be waived by the parties to it and in interest, if they think proper so to do. The principles of a waiver are too well settled in equity to be at this day disputed. It then remains to consider what has been done by the parties to establish a waiver.

1. The will, when the rights of the widow and the moral obligations of a husband are considered, must be taken as opening the question of dower. (1 Cruise, 133, sec. 21.) A widow has not only a civil, but a moral right to dower. Thus, Sir Joseph Jekyll says: "The relation of husband and wife, as it is the nearest, so it is the earliest and therefore the wife is the proper object of the care and kindness of the husband ; the husband is bound by the laws of God and man to provide for her during life, and after his death, the moral obligation is not at an end," &c. If the will does not, by express words, it certainly does by implication, recognizes her right to dower in her husband's estate ; and that a person may take by implication, cannot be questioned. To shew that the wife stands in that situation to be favored, we refer to 1 Cruise, 135, sec. 22. He there remarks: "Lord Bacon, in his reading in the statute of uses, says, ' The tenant in dower is so much favored, as that it is the common by-word in the law, that the law favoreth three things : life, liberty, and dower." When, therefore, it must be remembered that the contract in fact was framed by the

husband alone; that it was his act; that he made his will only a few days before his death, perhaps on his sick bed; that he then knew and saw the situation of his wife, far gone in pegnancy, that he was actuated by the moral feelings described in Cruise; that he was a good and pious man, as appears by the donation to the orphans, only to be defeated by the person who also wishes the widow's dower; can it for one moment be disbelieved that the husband intended to put it in his wife's power to take her dower, or the $1200 per annum, under the contract, which might in a small degree better her condition. If the will only recognizes her dower, that is a waiver. Recognizing a debt barred by the statute of limitations, is a waver of the statute. If the will amounts to no more than a waiver, on the part of the husband that puts an end to the question. The will opened the question and revived to the widow her right to dower, even if the contract would have barred her. The testator made in his will no provision for the payment of the annuity out of his real or personal estate. This he has given all away by his will. He takes no notice therein of the annuity; he therefore evidently intended that the widow should take either her dower or the $6000, and that either would extinguish the annuity.

2. But the acts of the complainant, stating to the widow, immediately after the death of her husband, that she had a right to dower advising her by all means, to take that in preference to any other provision; directing her to destroy the contract, which she accordingly destroyed, declaring that the counterpart was or should be destroyed; paying to her the third of the rent which became due a few days after the death of her husband; joining in a statement of facts to the then chancellor, presented to him on the 29th of March, 1819, stating expressly that the widow was entitled to, and had elected to take dower; continuing to pay her one third of the rents for her dower; deducting a commission therefor; joining in a second petition to the chancellor, of the 12th of June, 1820, again admitting her dower; executing a decree of the then chancellor, decreeing her dower, without asking for its repeal or revocation; continuing to pay one third of

the rents as dower ; in February, 1822, making an agree ment with the widow respecting the rents, &c. acting under it ; which acts are deemed evidence that the contract made by the widow, when an infant, was waived by the complainant, and establish the fact that he had assigned to her her dower in her husband's estate. But it is said he could not waive. It may be asked why ? Does he pretend that he is a trustee for any other than himself ? He certainly does not. Why then is he not bound by his own acts ?

3. There is nothing in this case to shew that M'Cartee was ignorant of the facts ; the whole case shews that he was well acquainted with them. The will itself speaks of the marriage articles. He does not even pretend ignorance of the facts ; he only pretends that John Anthon gave him bad advice, and that after the death of the child, he received better advice from Spencer, &c. I must here remark he produces no evidence of this new advice. Ingenuity cannot give this feature of defence any shape other than a mistake in point of law, if there be any mistake at all ; and if so, then the law, as well as equity decisions bearing on this point, is well settled in the cases referred to in Eden on Inj. 8, 9, and by Chancellor Kent, in *Storrs* v. *Barker*, ( 6 John. Ch. R. 169.)

4. That the acts proved in the case, and some of which have been referred to, amount to an assignment of dower. An assignment may be made by parol ; it requires no writing whatever ; and it may be out of rents. ( 1 Roper, Hus. & Wife, 401, 2, 3, 1 Cruise, 161, sec. 1, 163, and the cases there referred to. Moore's R. 59. Dyer, 91.) It requires no particular form or ceremony ; it is admitting the widow's right, and letting her into the receipts of the third of the rents ; and if she be willing to receive the same, that is, I apprehend, an assignment by parol. Such an assignment was made in this case. The widow consented to it ; appointed M'Cartee her agent or receiver, for reward ; and the parties acted under that arrangement, from the death of the husband, for several years. M'Cartee was competent to assign dower ; for in whatever character he pretends to hold this estate, being in the possession of it, claiming

the right to hold it as he does, (against all the world,) wheth-er he was tenant of the freehold, disseisor, abator, or intru-der, (1 Roper, Hus. & Wife, 387,) he had a right, and the widow had a right to call upon him, to assign dower ; and when once assigned, he who makes the assignment cannot avoid it, (except it be the heir, and then only for non-age ;) (1 Cruise, sec. 7, 8, *and the cases there referred to ;*) and he can annex no condition. If a condition is annexed, it is void, and the assignment remains. (1 Roper, Hus. & Wife, 402, 404.) If an adult heir over-assign, he has no remedy. (id. 404, 410.) The widow takes under a voluntary assign-ment as purchaser. (id. 401. Co. Litt. 173, a.

But the counsel for the complainant say : " Assuming that dower may be assigned by parol, it is founded on an undis-puted right to dower." The answer to this is that neither the defendant nor any other person disputed the widow's right to dower. He knew then what he knows now ; and he, with a full knowledge of all the facts, let her in to her dower, advised it himself, and it is now too late for him to dispute it ; he is out of time, and cannot now dispute it, nor avoid the assignment, (1 John. Ch. R. 512, and 2 id. 51,) unless he alleges and proves a fraud practised by the widow. The counsel also contend that " the assignment of dower can only be made by setting off to the widow a distinct pro-portion," and refer to 1 Roper, Hus. & Wife, 389. This is true, when the assignment is made by process of law of com-mon right. We refer to the same book, (page 395 to 400,) shewing that by consent she may have her dower in com-mon, and also of rents out of the estate to which she claims dower ; and the authorities there, and those referred to, show that when made out of the rents, it is of as binding force as if made by process of law. The cases of Watkins, 9 John. R. 245, of *Jackson* v. *Randall*, 5 Cowen, 168, and of *Jackson* v. *Waltermire*, 5 id. 302, do not apply at all. The proceedings had in the case of Watkins, and upon which the parties relied as evidence of title, were nothing more than the incipient steps to assigning dower, and the court there said the steps taken only proved boundaries in case of title. Now if we relied upon proof only that M'Cartee stated to us " the proportion of the rents we would be entitled to, provided we were entitled

to dower," then the cases referred to would apply. If the widow should be driven by the defendant to the necessity of taking the $6000, in such case, we apprehend that she is not to account for the monies voluntarily paid to her by the complainant, with a full knowledge of the facts, and received by her under his advice. (Eden on Inj. 8, 9, *and the cases referred to.*)

As to an election at this time between the $6000 and the contract, it is out of the question. Such election is put out of the question by the advice and course pursued by the complainant; for, by the re-marriage of Mrs. Teller, the $1200 to be paid her during life, ceased ; and it would not be unreasonable to suppose that she would not have changed her situation, and thereby relinquished a comfortable support during life, if it had not been that the complainant assured her that she was entitled to dower, and assigned it accordingly. *Wake* v. *Wake*, (1 Ves. 335,) does not apply. The widow does not here, as there, claim both ; she only asks the dower ; she does not ask to break up what has been acted upon ; the complainant asks that. The voluntary payments by him fall within the authorities in Eden, and the principles in the case of *Storrs* v. *Barker*, (6 John. Ch. R. 169.) Chancellor Kent says : " Defendant avers that he mistook the law of the land, and did not know that the devise of a feme covert was void, or that his title was good, till late in the year 1816. I am induced, from the proofs in the case, to believe the truth of the averment ; and the question then arises, whether ignorance of his title will prevent the application of the doctrine. The presumption is, that every man is acquainted with his rights, provided he has a reasonable opportunity to know them ; and nothing can be more liable to abuse, than to permit a person to reclaim, in opposition to all equitable circumstances, upon the mere pretence that he was at the time ignorant of his title. Such an assertion is easily made, and difficult to contradict. It is rarely that a mistake in point of law, with a full knowledge of all the facts, can afford ground for relief, or be considered as a sufficient indemnity against the injurious consequences of deception practised upon mankind. If he be allowed to plead his voluntary ignorance in

destruction of equitable rights growing out of his own acts and assertions, the grossest impositions, and the greatest frauds might be practised with impunity. It would seem to be a wise principle of policy that ignorance of the law, with knowledge of the fact, cannot be set up."

The statute concerning jointures, as well as the project creating equitable jointures, contradicts the common law; they are therefore to be construed strictly; (1 Cruise, 198 sec. 6 ;) and Lord Coke lays it down, that no estate limited to a woman shall be deemed a good jointure, and a bar to dower, unless it has certain requisites. (1 Inst. 36 b, 36 a. 1 Cruise, 198 , sec. 5, 6. 1 Roper, Hus. & Wife, 473, 459, 460. *Caruthers*, v. *Caruthers*, 4 Bro. C. C. 500.) It is defined to be " a competent livelihood of freehold for the wife, of lands or tenements, to take effect presently, in possession or profit, after the decease of the husband, for the life of the wife at the least." It must take effect, in possession or profit, immediately from the death of the husband ; it must not depend upon any contingency, to happen or not to happen, during the life of the husband. It must be absolute, and so that the jointure attaches, or becomes vested in the wife, at the death of the husband. (*Earl of Buckinghamshire* v. *Drury*, 2 Eden 64, 74. 1 Cruise 198, sec 7, 8, 9.) In 1 Roper, Hus. & Wife 459, it is stated that the mere possibility of the jointure of the wife not taking effect upon her husband's death renders i invalid ; it must be so limited as to ensure that circumstance. There is no case to be found, at law or in equity, to shew that a provision in lieu of dower, liable to be forfeited during coverture, is a bar to dower, nor can there be any such decision. The wife, during coverture, is under the control of her husband ; and if such should be the law, it would, in ninety-nine cases out of one hundred, be in the power of the husband to render that which the law always intended to be the most certain, the most precarious. The jointure must also be reasonable. (4 Kent's Com. 53 to 58.)

In this case the provision is made to depend upon a condition, " that she does not, during his life, contract any debt to the amount of $20, without his consent, for which he may be made accountable." It may be said that for necessaries his

consent would be implied. To that may be replied, for no other debt but for necessaries could he be made accountable. It therefore follows that her provision is made to depend upon her not contracting any debt, not even for necessaries unless she should, in case of a contest, be able to prove that she so contracted with his express consent. But suppose this depended upon her contracting a debt for an unecessary article, for which he might be made accountable to the amount of $20, during the life of husbaud and wife ; would not that render this provisio too uncertain ? In the restless case of *Drury* v. *Drury*, (2 *Eden*, 64,) the Earl of Hardwicke says : " Every certain provision, though not a jointure within the act, is good in equity. Again, it is to be freehold." In *Drury* v. *Drury*, the house of lords yielded to the words in that settlement, " should be settled and assured in the manner therein after mentioned, and also that the defendant, in case she should survive the said Sir Thomas Drury, should have or enjoy an annuity or yearly sum of six hundred pounds, clear of all taxes and deductions whatsoever, during her life, for and in the name of her jointure," &c. (2 Eden 38, 39,) as settling the jointure upon a freehold ; and they put the case to the judges as one under the statute of jointures, and not as a case upon contract. The contract in this case has no such words to hang upon. It is a naked covenant, binding no land ; nor could it at any time have been placed as a charge upon a freehold, as the Earl of Hardwicke says might have been the case in *Drury* v. *Drury*, (1 Roper, Hus. & Wife, 486, 503 ; *Girling* v. *Lee*, 1 Vern. 63 ; *Freemount* v. *Dedire*, 1 P. Wms. 429 ; 3 id. 212; 3 Atk. 327; *Carpenter* v. *Carpenter*, 1 Vern. 440.) But suppose words sufficient had been found in this contract, would not the suspense in which the provision was placed that is, the non-contracting of any debt, &c. have operated as an objection against the court of equity's decreeing it to be a lien on any specific property, upon the ground of the uncertainty of the provision's ever taking effect. If it is, as Eden says, (2 Eden, 74,) doubted whether the decision in *The Earl of Buckinghamshire* v. *Drury* be proper, it may be more so here, as that case was undoubtedly settled upon

principles of national policy, and not upon principles of law, or the rights of persons ; and but few, if any, of the consid- erations urged by the leading members of the house of lords, can be urged here, not even if we were about establishing a rule for the government of good society, who ape the no- bility, and claim an alliance with the great families in Great Britain ; for I believe it cannot be pretended that they have any jointure houses in this state ; nor can it be pretended that any of the dreadful consequences would follow here, by rejecting the contract, that Hardwicke supposed would in *Drury* v. *Drury*. No chancellor here will be liable to be im- peached for directing his master to settle the terms of the marriage of his ward, &c.

The propriety of the decision may well be doubted, then· after it has become a well settled principle that an infant cannot settle his freehold in jointure, nor a female bind her real estate by contract of marriage. Yet, upon the authori- ty of *Drury* v. *Drury*, the anomaly, to use the word of Spen- cer, that a female infant can release a right in another es- tate to be acquired, when she cannot in that already acquir- ed, ·is contended for. The jurisdiction of the court of equi- ty in enforcing contracts of marriage settlements, as well as all other contracts, existed before the statute of jointures. (1 Roper, 479.) Previous to the passing of the act, vari- ous contrivances were invented by lawyers of that day to prevent the wife from taking dower: (1 Cruise, 195. 1 Ro- per, Hus. & Wife, 456.)` It was pressed upon the legisla- ture to pass the act to prevent what was considered an in- creasing evil. Now it is a remarkable fact, if infants could bind themselves by a contract for a provision in lieu of dower to be enforced in equity, that there should have been such a pressing necessity for the statute, and that no case is to be found before the passing the act, nor until the restless case of *Drury*, to shew that equity would enforce such contracts of infants ; and we presume that it cannot be contended that the statutes enlarged the jurisdiction of the courts of equity, or enabled them to enforce contracts not binding in equity before the passing of the act.

THE CHANCELLOR. Before I proceed to examine the question whether the ante-nuptial contract was ever an equitable bar to the wife's right of dower in this case, I will notice the last point made by the counsel for the defendants. It is supposed by them that by the will of the testator he intended to waive his right to insist on the ante-nuptial contract; and to give the widow the right to take her dower in his real estate, or to receive the provision made for her by the will, or that made previous to the marriage, at her election. On a careful examination of the provisions of this will, I am satisfied that such never could have been the intention of the testator. It is true, the provision in the will is in lieu of dower, as well as of the marriage articles; and if the widow accepted it, she was required to release her dower, as well as to cancel the marriage contract. The counsel who prepared the will undoubtedly advised the testator that the ante-nuptial contract was not, at law, a bar of the right of dower. It is very probable that he also informed him there was even doubt as to its being an equitable bar. It was therefore almost a matter of course to insert a clause in the will declaring this new provision to be in lieu of dower as well as of the marriage contract; and to direct a release of the dower as well as the cancelling of the contract. In the clause relative to the election, however, the testator is careful not to authortize the widow to elect between her dower and the testamentary provision; but only between the provision made in the will, in lieu of dower, and that contained in the ante-nuptial contract, which was also in bar of dower.

The question whether an infant was barred by a jointure made before marriage, was for a long time unsettled in England. Lord Coke says: "If the jointure be made before marriage, the wife cannot waive it and claim her dower at the common law." (1 Inst. 36, b.) And in a note in the hand writing of Lord Hale, in the margain of Coke's Institutes, he remarks: "Though she be within age, as we see, she cannot waive." This note, made more than 100 years previous to the final decision of the question in the house of lords, is the first dictum which I have been able to find on this subject. The first judical determination appears to be in

the case of *Jordan* v. *Savage*, before Lord King, in 1733. (2 Eq. Ca. Abr. 102.) That was not a legal jointure under the statute, neither was the ante-nuptial provision set up in bar of legal dower. The estates of the husband were copy hold; in which, by the custom of the manor, the wife was entitled to the whole for life, as her free bench. The land, by an ante-nuptial contract, was settled in such a manner as to give her only the moiety, on the death of the husband, in the nature of a jointure, and in lieu of her customary estate. The wife being an infant, the question was whether she had a right to waive the provision made by the contract, and claim her customary estate in the whole. And the court of chancery considered the ante-nuptial settlement an equitable bar of the customary provision of the infant, by analogy to the statute respecting jointures, and that the infant was bound to accept the provisions as an equitable jointure. In the case of *Sice* v. *Seys*, in 1740, (Barnard. Ch. R. 117,) the lord chancellor asserted the same principle, though the question was not directly before him there. And it was again recognized in 1748, in the case of *Harvey* v. *Ashley*. (Wilm. R. 219, n.) In a case before the master of the rolls, in 1734, (*Carey* v. *Willis*. 9 Vin. Abr. 249,) Sir Joseph Jekyll is said to have held a different language. By a note of that case from the register's book, however, it will be found that the wife claimed the right of election; on the ground that it was not agreed that the ante-nuptial provision should be in lieu of dower. (See 1 Roper, Hus. & Wife, 466.) The question as to an infant's being bound by a jointure, I presume could not have been discussed in that case; and it is very improbable that a master of the rolls would undertake to overrule the decision which the lord chancellor had made but a few months before in the case of *Jordan* v. *Savage*.

In 1760, the case of *Drury* v. *Drury* came before Lord Henley, afterwards Earl of Northington, and was twice argued at great length, occupying in the whole seven days. It resulted in a decision by him, that an infant was not barred of her dower, either by a legal or an equitable jointure. The cause came before the house of lords on appeal, 1762, and this

1831.

M'Cartee
v.
Teller.

disputed question was finally put at rest in that country.  Although three very respectable common law judges concurred in opinion with Lord Henley, that an infant was not bound by a jointure in any case, yet the weight of authority, as well as the weight of judicial talent, was clearly in favor of the decision of the house of lords, on the appeal.  This case, as reported by Brown, (5 Bro. P. C. 570, *Earl of Buckingham* v. *Drury*,) merely contains the statement of the case, the arguments of counsel, and the reversal of the decree. But in the notes of the judgments and opinions of Ch. J. Wilmot, published forty years afterwards, his very able and elaborate opinion on this question is now found. (Wilmot's Opinions, 177.)  He examined this question at great length, and with much ability, and seems to have exhausted thereon the whole store of ancient learning, in relation to the rights and liabilities of infants.  He concurred in opinion with the majority of the common law judges, that the infant was barred.  And by a reference to the report of this case by a grandson of Lord Northington, (2 Eden's R. 60,) more recently published, it appears that the venerable Earl of Hardwicke, who held the great seal with such extraordinary reputation for about twenty years, but relinquished it on the formation of Pitt's first ministry, in 1756, concurred with a majority of the judges, and delivered a most able opinion on the question in the house of lords.  It also appears that the able and distinguished Lord Mansfield, then a member of the house of peers, also took a part in the decision, and voted in favor of a reversal of the decree.

In that case the ante-nuptial contract was entered into by the lady while under age, and was executed by her in the presence of her guardian, who subscribed the same as a witness.  The husband agreed that in case his intended wife should survive him, his heirs, executors or administrators should pay her, during her life, an annuity of £600, for and in the name of her jointure; which provisions she agreed to accept, in full satisfaction of her dower, and of her allowance, under the statute of distributions.  It was therefore finally settled by that case, that an infant is bound at law by a legal jointure; and that in equity, in analogy to the legal

1831.

M'Cartee
v.
Teller.

rule, the infant may also be barred by an equitable jointure, settled upon her before marriage, by the consent and approbation of her parents or guardian. Although some members of the profession entertained doubts of the correctness of this decision, yet as it was made by the court of the last resort, and with the entire approbation and concurrence of the most distinguished judges in England, it became the settled law of the land as to all cases coming within the same principles. And being made previous to our separation from the mother country, it must be considered equally binding on us here. An equitable jointure, or a competent and certain provision for the wife, in lieu of dower, if assented to by the father or the guardian of the infant before marriage, and to which there is no other objection but its mere equitable quality, is therefore an equitable bar. (*Corbit* v. *Corbit*, 1 Sim. & Stu. R. 612.)

Perhaps a strictly legal jointure, under the statute which was in force at the time this ante-nuptial contract was made, was a bar, *a provisione viri;* and that the actual assent of the wife or her guardian, need not be proved to establish the validity of such a jointure. But even in such a case, I apprehend it would be a fraud upon the wife, and would not bind her in equity, if the fact, that a provision in lieu of dower had been made, was intentionally concealed from her and her friends or legal protectors until after the marriage. By the revised statutes, to constitute a valid bar of dower, the provision by way of jointure must be expressly assented to in writing, by the lady if an adult, and both by her and her father, or guardian, if she is an infant. (1 R. S. 741.) The distinction between legal and equitable bars is now abolished; and hereafter the infant will be bound in the same cases and to the same extent as an adult.

In the case of infants, under the former law, this court, as to equitable bars, proceeded only in analogy to the statutory provision. But an adult female might in equity bind herself by an ante-nuptial agreement, to receive a simple pecuniary provision, although uncertain as to the time of its commencement, or as to the extent of its duration. (Per Lord Alvanley, 4 Bro. C. C. 513. Clancy, 221, 2. 1 Mad. R. 613.) To make

a mere equitable jointure binding on the infant, it was necessary that the provision should be as beneficial to the infant, and as certain, as that required in a legal jointure to constitute a legal bar. . In other words, it must be a provision to. take effect in possession or profit immediately on the death of the husband and to continue during the life of the widow; it must be made with the express or implied assent of the parent or guardian, and in satisfaction or in lieu of dower; and it must be a reasonable and competent livelihood for the wife, in reference to the circumstances and situation in life of the parties, the value of the husband's estate, and the extent of the wife's portion received with her on the marriage. (1 Inst. 36, b. 4 Kent's Com. 53. Wilmot's Opinions, 209.)

In this case the wife brought no portion to the husband; and he left a large real estate. By the ante-nuptial contract he gave to her, in addition to the furniture and plate, an annuity of $1200, to commence immediately on his death; and he made it an equitable charge upon the real and personal estate of which he should die seised and possessed. The answer to the suggestion that the whole estate might be disposed of, or dissipated, before his death, appears to have been given by Lord Hardwicke, in the case in the house of lords, ( 2 Eden's R. 67 ;) that " the *spending* of the property on which the equitable jointure was charged would be an eviction in equity, and consequently would have remitted her to her dower, in analogy to the eviction of the jointure at law."

The only objections therefore to this ante-nuptial provision, as a valid bar of dower, in equity, are the conditions annexed to the commencement and continuation of the annuity. And as the infant is only bound by an equitable jointure, in analogy to the statute, if these conditions would not have been binding on her as a legal jointure, had they been contained in a conveyance of a freehold estate before marriage, they cannot now constitute an equitable bar.

. It seemed to be taken for granted by the counsel for the complainant on the argument, that the conveyance of an estate before marriage, to an adult female, during her widowhood, by way of jointure, would bar her right of dower; and could not be waived by her after the death of the

husband. But I do not think the counsel on either side examined that question with their usual industry and discrimination. The only case I have been able to find, in which the question has arisen on such a limitation, is the one reported by Sir Francis Moore, in the third year of the reign of Queen Elizabeth. (Moore's R. 31, pl. 103.) By that case it appears that the husband, by his will, devised all his lands to his wife, during her widowhood, in lieu of dower; and after his death she entered under the devise, and again married. Chief Justice Dyer thought the right of dower was only suspended during the continuance of the particular estate. But Weston and Benloe, justices, held that the estate was a freehold, and only determinable by her own act; and as she had accepted of the particular estate in the whole premises, as a jointure, she could not afterwards claim dower in the remainder also. In Vernon's case, which came before the same court a few years afterwards, (3 Dyer's R. 317, a; Benloe & Dal. R. 210; 4 Coke's R. 1; 3 Leon. R. 28, S. C.;) an estate, by way of jointure, was granted by the husband, after marriage, to the wife for life, on condition that she performed the will of her husband. After his death she agreed to this jointure, and took possession of the land so granted to her; and it was held, by a majority of the court, to be a good legal jointure, within the statute. It will be seen that in neither of these cases was the jointure binding on the wife, if she had not assented thereto after her title to dower had accrued; it being made during coverture. Both cases, therefore, came within the ninth section of the statute concerning uses and wills. (27 Hen. 8, ch. 10. 1 Evans' Statutes, 414.) By examining that section it appears that the widow is bound by the acceptance of a freehold, given to her during coverture, "for the term of her life, or otherwise, in jointure." The voluntary acceptance of a conditional or determinable fee, after the death of the husband, is therefore within the words of that section of the statute. And in both of these cases the court placed their decisions upon the voluntary acceptance of the jointure, by the widow. In the case of the *Earl of Buckinghamshire* v. *Drury*, Chief Justice Wilmot says: "The dif-

ferent form of pleading a jointure made before and after marriage, is extremely material, to prove that it is the act of the husband which makes the bar in the one case, and the subsequent agreement of the wife which makes the bar in the other." (Wilmot's Op. 215.) Bacon also says: "If an estate be limited to the wife on condition, her acceptance of such a conditional jointure makes it good." (3 Bac. Abr. 714. Jointure, B. 2.) This distinction does not seem to have been noticed by Roper, who says, generally, that "if the jointure be limited to the wife after the death of her husband, *durante viduitate*, or upon condition that she perform her husband's will, &c. such limitations, made in lieu of dower, will be good legal jointures." (1 Roper's Hus. & W. 462.) But Vernon's case, as reported in Coke, is the only authority he refers to, to support this position. Clancy, on the other hand, recognizes the distinction. He lays down the rule that an estate for the life of the widow, on condition, is a good jointure, within the intent of the act, if the widow enters and accepts the conditional freehold. He then adds: "But it would seem that a jointure of this description, although it were before marriage, would not be binding on the widow, unless, after the husband's death, she enters and accepts the conditional estate." And he also refers to Vernon's case as reported by Lord Coke, to sustain that opinion. (Clancy, 209.)

This distinction, I think may be supported on principle. Lord Coke says: "Reasonable and legitimate dower belongs to every woman, of a third part of all the lands and tenements of which the husband was seised in his demesne as of fee." (Co. Litt. 36 b.) *Doti lex favit* is a legal maxim. And Lord Bacon, in his reading on the statute of uses, says it is the common by-word of the law, that the law favoreth three things: life, liberty, and dower. It was not, therefore, the intention of the statute respecting jointures, to deprive the widow of her common law right, without a fair equivalent. Hence, if she is to be barred *a provisione viri* merely, she must have an estate equal in its commencement and duration with that which the common law has provided; and unclogged with conditions and restrictions which may destroy the right. But with her own assent, a less certain provision of freehold may be

substituted. At the time of making this statute, a freehold estate alone was considered a fair equivalent for a freehold; and therefore, at law, the acceptance of such an estate only, was held to be a bar of dower, which was a freehold. (a) If such an estate was settled on the wife, although it was a base or determinable fee and might not continue for her life, if she entered on the estate and elected to receive it in lieu of dower, after the death of her husband, she was concluded by such election, in analogy to the principle by which she was concluded at the common law, by the acceptance of dower *ad ostium ecclesiæ*, or *ex assensu patris*, after the death of the husband. A court of equity therefore, by analogy, will bar the right in the one case by an adequate provision of equal duration with her dower, settled on her before marriage; and in the other, by her voluntary agreement, before the marriage, or after its termination, to accept any fair equivalent, without regard to the continuance of the provision. But in the latter case, as an infant was incapable of consenting, before the recent statute, she was not bound in equity by an ante-nuptial provision, clogged with conditions limiting its duration; and she might make her election after the disability was removed.

The condition that the wife should live chaste, inserted in these marriage articles, could not be objectionable; because a breach of that condition would equally have forfeited her dower. As to the condition that she should not run her husband in debt, I have more doubts.

The other objection, that the annuity was limited to the widowhood of the infant, and has not been accepted by her since the removal of her disability to contract or assent, I must consider fatal to the complainant's claim of an equitable bar. In ordinary marriages, such a limitation might not be considered as unreasonable. The chances of the wife's outliving the husband are about equal; and if she survives, she will probably have arrived at an age when it may not be considered a very great hardship if she is compelled to live single, to preserve her jointure. But when an old man of

(a) See *Jickling's Analogy between Legal and Equitable Estate*, p. 156.

seventy-five marries a lady too young even to make a valid contract to bar her dower ; when the frost of January weds the bloom of May, such a condition as this is inequitable and unjust. After she has sacrificed her youth to him, to share his frozen couch for a few years at farthest, it is unreasonable to impose upon her the obligation of living single for the rest of her life, as the condition upon which alone she is permitted to retain an equitable equivalent for her dower in his large estate. Such a provision, and under such circumstances, ought not to be enforced, as an equitable jointure, against an infant who has done no act to sanction it since the death of the husband.

Another objection to granting equitable relief in this case is, that the complainant has substantially assigned to the widow the third part of the rents and profits of the estate, as her legal dower. As both parties acted on the supposition that the ante-nuptial contract was not binding on the widow, if they were under a mistake, it might perhaps be remedied at this time, provided both parties could be restored to the situation in which they were placed, in respect to this matter, when that assignment took place. But if the complainant has been deceived as to his equitable rights, he has also been the means of deceiving her, by not setting up this equitable claim in due season. If she had supposed that she was to lose both her annuity and her dower by marrying a second time, it is very probable she would have postponed the marriage until she could make some composition with the devisees in regard to this annuity. At her age, and with the power of continuing the annuity for life, if she pleased, she certainly could have obtained a very liberal allowance in consideration of the relinquishment of future payments. Where there is merely an equitable bar of dower, it is certainly optional with the heir or devise, whether he will insist on it or otherwise. If he assigns dower under such circumstances, this court will not relieve him, except upon some new ground of equity—as mistake or accident; and in such case too, he should offer to do equity. Under the circumstances of this case, if any relief as against the widow's dower could be granted, it should be on the condition of paying to her the

annuity for life, or a fair equivalent therefor, notwithstanding her marriage since the assignment of dower.

It is said however that the complainant is a mere trustee, and therefore that his acts are not binding on the *cestui que trust.* I do not intend to express any definite opinion on that point at this time; but under the decision of the court of errors in respect to this will, I doubt whether the executors are trustees for any one. There is no allegation in the bill that there are any heirs of the testator in existance capable of taking this estate by descent, or as *cestui que trusts* by implication. If there are any, they should be parties; so that the decree might bind them, if they are not already bound by the act of the executor in assigning dower. If the legal and equitable estate are united in the executors, on the ground that they took a conditional fee which has become absolute by the death of the child, this objection to the validity of the assignment of dower is untenable. If, on the other hand, their estate terminated with the life of the child of the testator and the land escheated to the state for want of heirs, the complainant has no equitable rights to protect, and this bill cannot be sustained. A defendant in an ejectment suit who has no interest in the land, either in his own right or as the trustee or legitimate representative of another, cannot come here to set up an equitable defence to the suit. If neither of the parties to the suit have any equitable claim to the property in dispute, this court will leave them to their legal rights. (*Meigs* v. *Dimock,* 6 Conn. R. 458.)

The order of the vice chancellor denying the application for an injunction was correct: and must be affirmed, with costs.